IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Lillie M. Walker, | ) | C/A No. 1:04-1370-MBS |
| Plaintiff, | ) | |
| vs. | ) | |
| Bechtel Savannah River, Inc.; Westinghouse Savannah River Company, LLC; and WSRC/BSRI Employee Benefits Program, | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

This is an action seeking review of a claim for total and permanent disability ("TPD")

benefits under an employee benefit plan governed by the Employee Retirement Income Security Act

of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.* Plaintiff Lillie M. Walker alleges that she was

denied TPD benefits to which she was entitled under a Disability Plan (the "Plan") for employees

provided by Bechtel Savannah River Company, Inc. ("Bechtel"), Westinghouse Savannah River

Company, LLC ("WSRC"), and the WSRC/BSRI Employee Benefits Program (collectively

Defendants). Plaintiff brings this action challenging the denial of benefits under 29 U.S.C. §

1132(a)(1)(B), which provides:

> A civil action may be brought--(1) by a participant or beneficiary . . . (B) to recover
> benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the
> terms of the plan, or to clarify [her] rights to future benefits under the terms of the
> plan[.]

Plaintiff also alleges a claim pursuant to 29 U.S.C. §§ 1132(a)(3) and (c)(1), and 1133

contending that Defendants did not follow proper claims procedures.

This matter is before the court on cross-motions for judgment. The court dispenses with oral argument because the positions of the parties are sufficiently presented in the briefs. The court has considered all of the submissions by the parties, the administrative record, and the Plan. The court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff was born on March 11, 1947. (Joint Stipulation at WSRC 0008, Walker v. Bechtel Savannah River, Inc., C/A No. 1:04-1370, ECF No. 36 (hereinafter "Joint Stipulation 1".) Plaintiff was employed by BSRI and WSRC as a laborer and night-shift foreman at the Savannah River Site beginning on or about October 22, 1987. (Complaint at ¶ 15 and Answer at ¶¶ 5, 15, Walker v. Bechtel Savannah River, Inc., et al., C/A No. 1:04-1370 (D.S.C. 2004), ECF Nos. 1 and 4.) Plaintiff was a participant in the WSRC/BSRI Employee Benefits Program, specifically, the BSRI Option A Craft Disability Plan. (Defendant's Memorandum in Support of Judgment at 2, Walker v. Bechtel Savannah River, Inc., et al., C/A No. 1:04-1370 (D.S.C. 2004), ECF No. 37.; Plaintiff's Memorandum in Support of Judgment at 1, Walker v. Bechtel Savannah River, Inc., et al., C/A No. 1:04-1370 (D.S.C. 2004), ECF No. 40.)

2. BSRI and WSRC are the sponsors, administrators, claims administrators and trustees of the Plan. (Answer at ¶9, Walker v. Bechtel Savannah River, Inc., et al., C/A No. 1:04-1370 (D.S.C. 2004), ECF No. 4; Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at WSRC 0093, 0111, Walker v. Bechtel Savannah River, Inc., et al., C/A No. 1:04-1370 (D.S.C. 2004), ECF No. 25.) However, the Department of Energy reimburses the Plan for all benefits paid from the Plan. (Defendant's Memorandum in Support of Judgment at Ex. 3, Walker v. Bechtel Savannah River, Inc., et al., C/A No. 1:04-

1370 (D.S.C. 2004), ECF No. 37; *see also* Plaintiff's Reply to Defendants' Supplemental Brief as to Section 1132(c) Statutory Remedies at 7, Walker v. Bechtel Savannah River, Inc., et al., C/A No. 1:04-1370 (D.S.C. 2004), ECF No. 95.)

3. After completing one year of continuous employment, Plaintiff was eligible for TPD coverage. (Joint Stipulation 1 at WSRC 0135.) Among other things, the Plan provides: "You qualify for Total and Permanent Disability benefits if you are unable to work at any reasonable occupation due to an accident or illness." (*Id.* at WSRC 0137.) The Plan further provides:

> The information required to qualify for Total and Permanent Disability includes medical evidence that supports your total and permanent disability and an authorization to release medical records and doctor's reports to the Medical Department. The medical evidence should include a statement from your attending physician as to the reason why you are disabled and the length of time your disability is expected to last.

(*Id.* at WSRC 0140.) The Plan excludes any injury or illness occurring after employment with WSRC/BSRI ends for any reason. (*Id.* at WSRC 0141.) The Plan also provides: "Your eligibility for coverage under the Disability Income Plan ends when you are no longer an active Option A Craft Employee." (*Id.* at WSRC 0136.)

4. The Plan states that if an employee's claim for TPD is denied, the employee can appeal this decision to the Plan administrator within 60 days of claim denial by the Claims Administrator. (Joint Stipulation 1 at WSRC 0143.) The Plan further states:

> The Plan Administrator and those persons acting on the Plan Administrator's behalf are vested with full power and sole discretion to interpret all the terms of the plan and will make the final determination based solely on the applicable facts and evidence. All decisions of the Plan Administrator are final and binding.

(*Id.* at WSRC 0143.)

5.	On December 14, 1995, the Plaintiff injured her knee in an automobile accident. (Joint Stipulation 1 at WSRC 0027.)  On February 27, 1996, Dr. William L. Clark, Jr., an orthopaedic surgeon, performed arthroscopy and debridement on the Plaintiff's right knee. (*Id.* at WSRC 0029.)  On March 7, 1996, Dr. Clark noted the existence of chondromalacia of the femur and tibia on the medial side with loose pieces of articular cartilage. He further noted that Plaintiff could return to light work activity on March 14, 1996, but should be considered disabled until March 28, 1996. (*Id.* at WSRC 0026.)

6.	On November 20, 1996, Plaintiff presented to Dr. Clark after either tripping or having her right knee buckle under her.  (Joint Stipulation 1 at WSRC 0025.)  Dr. Clark noted some mild swelling and a "little narrowing in the medial joint line." (*Id.*)  Plaintiff was given a prescription for Naprelan.  (*Id.*) On December 6, 1996, the Plaintiff reported that she was still experiencing pain in her right knee to such an extent that she was having "significant difficulty with activity due to pain." (*Id.* at WSRC 0033.)  Plaintiff was instructed in a home program of exercises to improve her range of movement.  (*Id.*)  On February 25, 1997, Dr. Clark indicated in a letter that Plaintiff had a "10% permanent impairment to the lower extremity due to arthritic changes as a result of chondromalacia of the patella and medial femoral condyle secondary to injury."  (Joint Stipulation 2 at WSRC 0552, Walker v. Bechtel Savannah River, Inc., C/A No. 1:04-1370, ECF No. 86 (hereinafter "Joint Stipulation 2.")  Dr. Clark indicated that Plaintiff's condition could worsen or could remain stable.  (*Id.*)

7.	On January 29, 1999, Plaintiff presented to Dr. Clark complaining of pain in her left foot, ankle and Achilles. (Joint Stipulation 1 at WSRC 0023-0024.)  With regard to treatment, Plaintiff was instructed in various stretches, the use of ice, and activity modification.  (*Id.*)

8.    On October 15, 1999, Dr. Clark diagnosed the Plaintiff with possible cervical radiculopathy and bursitis in the shoulder after she complained of a sudden onset of pain in her neck which radiated to her left shoulder. (*Id.* at WSRC 0021-0022.)

9.    On April 18, 2000, Dr. Keith Sue-Ling, a cardiologist, evaluated Plaintiff for high blood pressure and chest pain. (Joint Stipulation 2 at WSRC 0185.) Dr. Sue-Ling found that Plaintiff had high blood pressure and atypical chest pain, but that both conditions were stable and that Plaintiff was doing well on new medications. (*Id.*) Dr. Sue-Ling recommended that Plaintiff continue on the same medications and diet, and schedule a follow-up visit in four months. (*Id.*)

10.   On April 26, 2000, the Plaintiff complained to Dr. Sue-Ling of swelling in both legs and some discomfort in her right leg when she was on her feet. (Joint Stipulation 1 at WSRC 0020.) Dr. Sue-Ling noted that Plaintiff was obese and had a significant history of chronic hypertension, chronic lung disease and chest pain, but that a recent heart catheterization previously showed no significant coronary artery disease. (Joint Stipulation 2 at WSRC 0288.) Dr. Sue-Ling did not note any significant heart murmurs, but found that Plaintiff had "redness covering the lower half of her right leg," indicating probable cellulitis. (*Id.*) Plaintiff was admitted to the hospital and discharged on April 29, 2000 because her cellulitis was resolving. (Joint Stipulation 2 at WSRC 0290.) On May 5, 2000, Dr. Sue-Ling noted that Plaintiff cellulitis was resolving. (Joint Stipulation 2 at WSRC 0183.) On May 12, 2000, Dr. Sue-Ling noted that Plaintiff's high blood pressure was stable and that she was doing well with her cellulitis. (Joint Stipulation 2 at WSRC 0182.) Dr. Sue-Ling also noted that Plaintiff would return to work once her symptoms resolved. (*Id.*)

11.   On May 22, 2000, Dr. Sue-Ling noted that Plaintiff might have hypercalcemia or a

hyperparathyroid condition, and that he would get her an endocrine consult. (Joint Stipulation 2 at WSRC 0181.) On June 9, 2000, Dr. Sue-Ling examined Plaintiff noting that her high blood pressure was stable and indicating that she should have a follow-up visit in three months. (Joint Stipulation 2 at WSRC 0180.)

12.     On August 18, 2000, Dr. Sue-Ling examined Plaintiff who was having heart arrhythmia and complaining of shortness of breath. (Joint Stipulation 2 at WSRC 0179.) Dr. Sue-Ling indicated that Plaintiff's high blood pressure and TR (tricuspid regurgitation) were stable, that Plaintiff should continue on the same medications and diet, and that Plaintiff should have a follow-up visit in four months. (*Id.*)

13.     On September 22, 2000, Plaintiff underwent a Nuclear Medicine Study scan to investigate her possible parathyroid condition. (Joint Stipulation 2 at WSRC 0253.) The scan results were normal. (*Id.*) On October 20, 2000, Plaintiff was referred to Dr. Lynn Tucker for hyperparathyroidism. (Joint Stipulation 2 at WSRC 0301.) Dr. Tucker indicated that although Plaintiff's scans were normal, Plaintiff may have an adenoma that could not be seen in the scan. (*Id.*) Plaintiff opted to go forward with surgery involving a full neck exploration. (*Id.*) On October 30, 2000, the Plaintiff had her surgery and a parathyroid tumor was removed. (Joint Stipulation 2 at WSRC 0299.)

14.     On November 2, 2000, Plaintiff presented with severe pain and swelling of the right lower extremity. (Joint Stipulation 2 at WSRC 0299.) It was concluded that Plaintiff had superficial thrombophlebitis of the right lower extremity and varicose veins. (*Id.* at WSRC 0300.) The doctor recommended that Plaintiff take Motrin, use warm compresses, keep the leg elevated and wrapped, and have a follow-up examination in one week. (*Id.*) On November 10, 2000, Plaintiff had her follow-up visit at which the doctor noted that she was

"much improved." (*Id.* at WSRC 0298.) The doctor recommended that Plaintiff continue to elevate her leg, and use warm compresses and Motrin for another week; and indicated that Plaintiff should consider varicose vein surgery. (*Id.*)

15. On November 14, 2000, Plaintiff had a follow-up visit with Dr. Tucker regarding the excision of her parathyroid tumor. (Joint Stipulation 2 at WSRC 0297.) Dr. Tucker noted that Plaintiff was doing well, but that she had developed a mild bronchitis and a pneumonia, which were both well controlled. (*Id.*)

16. Plaintiff attempted to return to work at the Savannah River Site on December 4, 2000, but was unable to finish the day. (Joint Stipulation 2 at WSRC 0438.) Plaintiff did not subsequently return to work. (Complaint at ¶ 22, Walker v. Bechtel Savannah River, Inc., *et al.*, C/A No. 1:04-1370, ECF 1.)

17. In December 2000, Plaintiff timely applied for short term disability ("STD") benefits and TPD benefits. (Complaint at ¶ 20 and Answer at ¶ 20, Walker v. Bechtel Savannah River, Inc., et al., C/A No. 1:04-1370 (D.S.C. 2004), ECF Nos. 1 and 4.) Plaintiff was granted STD benefits under the Plan. (Complaint at ¶ 27 and Answer at ¶ 27, Walker v. Bechtel Savannah River, Inc., et al., C/A No. 1:04-1370 (D.S.C. 2004), ECF Nos. 1 and 4.) Plaintiff's STD benefits expired in May 2001. (Defendant's Memorandum in Support of Judgment at 2, Walker v. Bechtel Savannah River, Inc., et al., C/A No. 1:04-1370 (D.S.C. 2004), ECF No. 37.)

18. On December 15, 2000, Dr. Sue-Ling examined Plaintiff who was complaining of chest pain. (Joint Stipulation 2 at WSRC 0178.) Dr. Sue-Ling indicated that Plaintiff's high blood pressure condition was stable and that Plaintiff had trace MR (mitral regurgitation). (*Id.*) Dr. Sue-Ling recommended that Plaintiff continue on the same medications, lose weight and

have a follow-up visit in four weeks.  (*Id.*)

19.    On December 20, 2000, the University Hospital Occupational Health Centers examined Plaintiff to detect any health effects of her work at the Savannah River Site.   (Joint Stipulation 1 at WSRC 0040-41.)  The Plaintiff's results were normal in the following areas: blood pressure, cholesterol, blood sugar, kidney function, liver function, beryllium exposure, lead exposure, hearing tests, asbestos exposure, and silica exposure. (*Id.*)  The examination found evidence that the Plaintiff was overweight, had superficial varicosities in her legs, a heart murmur, a decrease in the volume of air in her lungs, unidentified chest abnormalities, a mildly enlarged heart, and prior thyroid surgery. (*Id.*)

20.    On January 10, 2001, Dr. Sue-Ling examined Plaintiff who was complaining of epistaxis (nose bleed).  (Joint Stipulation 2 at WSRC 0177.)  On January 16, 2001, Plaintiff went to the Emergency Room at St. Joseph Hospital in Augusta, Georgia for epistaxis, which later resolved.  (Joint Stipulation 2 at WSRC 0281, 0283, 0286.)

21.    On January 23, 2001, Dr. Sue-Ling examined Plaintiff noting that she had high blood pressure, which had been increasing, but no chest pain.  (Joint Stipulation 2 at WSRC 0176.)  On February 2, 2001, Dr. Sue-Ling again examined Plaintiff, finding that her high blood pressure had increased, that she had TR and no chest pain.  (Joint Stipulation 2 at WSRC 0175.)  Dr. Sue-Ling indicated that Plaintiff needed a follow-up examination in one week. (*Id.*)

22.    On February 9, 2001, Dr. Sue-Ling examined Plaintiff noting that she had mild TR and high blood pressure, which had reduced since the last visit.  (Joint Stipulation 2 at WSRC 0174.)  Dr. Sue-Ling's treatment plan involved a three month follow-up examination, continuation of medication, and weight loss.  (*Id.*)

23. On March 5, 2001, Dr. Ronald Brown, a gastroenterologist, performed a total colonoscopy with biopsy on Plaintiff. (Joint Stipulation 1 at WSRC 0035.) Dr. Brown found evidence of gastrointestinal hemorrhage, colon polyp, and hemorrhoids. (*Id.*) The colon polyp was removed. (*Id.*) Post-operatively, Dr. Brown found evidence of gastrointestinal hemorrhage, abdominal pain, nonerosive gastritis and hiatal hernia. (*Id.* at WSRC 0037-38.)

24. In a letter dated March 6, 2001, the Breast Diagnostic Center in Augusta, Georgia notified the Plaintiff that a mammogram had found an abnormal area in her breast that was likely benign. (Joint Stipulation 1 at WSRC 0044.) Plaintiff was informed that she should have a short term follow-up exam to confirm that this area had not changed. (*Id.*)

25. On March 8, 2001, Dr. William M. Kittle, Plaintiff's pulmonologist, issued the following statement:

> I have been asked to formulate an opinion regarding potential physical impairment on [Plaintiff] from a pulmonary perspective. [Plaintiff] is followed for bronchial asthma, which is clinically mild and persistent, as well as obstructive sleep apnea with nocturnal hypoxemia requiring therapy with nocturnal nasal CPAP. She is also morbidly obese and has other medical problems including chronic hypertension and hypertensive cardiovascular disease with left ventricular diastolic dysfunction.

> [Plaintiff] was last evaluated in the office on 1/12/01 at which time her asthma symptoms at baseline were significantly improved after a recent change in her pulmonary medical regimen. Despite the improvement in her baseline asthma symptoms, [Plaintiff] continues to have problems at work, however, because of easy fatigability and continued exertional dyspnea. Her pulmonary function studies on this last visit after inhaled bronchodilator showed an FEV1 of 1.82 liters, which is 73% predicted and which represented a 5% increase after administration of the bronchodilator. With regards to her obstructive sleep apnea/hypopnea syndrome, her respiratory disturbance index on the original sleep study of 4/15/99 was 14.07 per hour, which is of a mild degree in severity.

> Based on recent guidelines for assessment of asthma disability issued from the American Thoracic Society and based upon [Plaintiff's] most recent clinical evaluation, it is my pulmonary opinion that she is in a class II

impairment representing a 10-25% physical impairment on the basis of her asthma. As far as I can determine with regards to her underlying sleep apnea and in review of the most recent AMA disability guidelines for sleep apnea, she should be considered 1-9% physically impaired on the basis of her sleep apnea. I would consider these medical impairments to be permanent with regards to the respective disease processes.

[Plaintiff] might also qualify for further disability impairment ratings based on her other problems, specifically chronic hypertension, hypertensive cardiovascular disease, and morbid obesity, though assessment of these impairment ratings are out of the realm of my subspecialty expertise and I would refer to her cardiologist or other general medical provider.

(Joint Stipulation 1 at WSRC 0012-0013.)

26. On March 22, 2001, in response to the Plaintiff's request for TPD benefits, Savannah River Site Doctors Pratt and Entrekis completed a Permanent Disability Examination Summary on Plaintiff. (Joint Stipulation 1 at WSRC 0009-00010.) The doctors diagnosed Plaintiff with permanent mild asthma and sleep apnea, and opined that her prognosis was good. (*Id.* at WSRC 0009.) The doctors concluded that Plaintiff may not be able to do her job in the labor craft at the Savannah River Site, but that she was not totally disabled. (*Id.*) The doctors indicated that Plaintiff may require special job consideration. (*Id.*) The doctors further indicated that if Plaintiff secured employment other than at Savannah River Site, she would be capable of maintaining employment on a continuing basis. (*Id.* at WSRC 0009-0010.) The doctors concluded Plaintiff would be trainable in a skill that would qualify her for other employment. (*Id.* at WSRC 0010.)

27. On March 29, 2001, WSRC and BSRI referred the case to Aetna US Healthcare, for independent medical review. (Joint Stipulation 1 at WSRC 0008.) By letter dated April 11, 2001, Aetna's nurse consultant determined that Plaintiff could perform sedentary employment, "which is defined as sitting (66%), with no lifting greater than 10 pounds."

Accordingly, the nurse consultant recommended that Plaintiff's claim for TPD benefits be denied. (*Id.* at WSRC 0006-0007.)

28. By letter dated April 17, 2001, the Plan Administrator denied Plaintiff TPD benefits stating:

> The WSRC/BSRI Medical Department requested a review of your eligibility for a Total & Permanent disability [] benefit under the WSRC/BSRI Disability Income Plan (Plan). Current medical information was sent to an outside disability review group with a request to make a recommendation on your qualification for benefits under the Plan.
>
> After an impartial review of available medical information and a recommendation by the outside disability review group, it has been determined that you do not meet the qualifications for a [TPD] benefit. Your medical restrictions include easy fatigability and exertional dyspnea, including 10-25% physical impairment on the basis of your asthma and 1-9% physical impairment on the basis of your sleep apnea. However, these restrictions do not preclude you from working at a sedentary level, defined as sitting (66%), with no lifting greater than 10 pounds.
>
> With this notification, the Medical Department and your manager are also being informed of this decision. You have the right to appeal the decision to deny you [TPD benefits]. If you have additional medical information to support the fact that you should be considered totally & permanently disabled, you may appeal the decision in writing to the Plan Administrator, within 60 days of the date of this notice, including any additional information, as explained in the "Benefits Overview and General Information" booklet of your Employee Benefits Handbook (available from your Human Resources Representative), beginning on page 31.

(Joint Stipulation 1 at WSRC 0001.) When Defendants denied Plaintiff TPD benefits, they also terminated her health insurance and life insurance. (*See* Joint Stipulation 2 at WSRC 0769, 0771.)

29. On April 20, 2001, Plaintiff had a follow-up visit with Dr. Kittle for her sleep apnea and asthma. (Joint Stipulation 2 at WSRC 0389). Dr. Kittle noted that Plaintiff "has done well and she is not having any regular wheezing, chest tightness, or dyspnea." (*Id.*) Dr. Kittle concluded that Plaintiff has bronchial asthma that is "mild persistent and well-controlled",

"obstructive sleep apnea/hypopnea syndrome with nocturnal hypoxemia" that is "stable and asymptomatic on h.s. nasal CPAP," and morbid obesity. (*Id.*)

30. Also on April 20, 2001, Dr. Tucker performed a follow-up examination with regard to Plaintiff's previous mammogram. (Joint Stipulation 2 at WSRC 0296.) Dr. Tucker concluded that the area noted in the mammogram was nothing suspicious, but that Plaintiff should have a follow-up mammogram in September. (*Id.*)

31. In a letter dated April 26, 2001, Dr. Keith Sue-Ling, Plaintiff's cardiologist, stated:

> Mrs. Hill is a 53 year old female who has a history of numerous medical problems including organic heart disease. From a cardiovascular standpoint, she is unable to obtain any gainful employment and is considered totally disabled for [sic] a medical standpoint.

(Joint Stipulation 1 at WSRC 0017.)

32. On April 30, 2001, the Plaintiff presented to Dr. Clark for pain in her lower back, right leg, and hip. (Joint Stipulation 1 at WSRC 0019.) Plaintiff was given a prescription for Celebrex and instructed in some back and hip exercises. (*Id.*)

33. In a letter dated May 1, 2001, Dr. Leyla El-Choufi, Plaintiff's endocrinologist, submitted her opinion of Plaintiff's condition:

> I have been following [Plaintiff], initially as a consultant, for hypercalcemia and, more recently, as her primary care physician. This is a summary letter about her general health. [Plaintiff] has hypertension, that has been quite difficult to control and has required several medications. She is followed by Dr. Sue-Ling for this. She also has a history of chronic obstructive pulmonary disease and sleep apnea. She has dyspnea on minimal exertion. She is followed by Dr. Kittle for this. She recently had a GI bleed and was seen by Dr. Ronald Brown. She has gastritis and hiatal hernia. She had a recent abnormal mammogram and she was referred, on her visit last month, to Dr. Lynn Tucker for further evaluation. She is morbidly obese and that has contributed to the above chronic illnesses. She had a parathyroid adenoma, which was removed in 11/2000. She also has a history of anxiety/depression.

(Joint Stipulation 1 at WSRC 0016.)

34. In a letter dated May 3, 2001, the Plaintiff appealed the denial of TPD benefits and submitted additional information to support her case. (Joint Stipulation at WSRC 0014-0036.)

35. On May 10, 2001, Plaintiff was examined by Dr. Sue-Ling, who noted that Plaintiff's high blood pressure and MR were stable; and recommended a four month follow-up visit, weight loss, and a low salt diet. (Joint Stipulation 2 at WSRC 0173.)

36. Plaintiff was terminated from her position on or about May 13, 2001.[1] (Answer at ¶ 7, Walker v. Bechtel Savannah River, Inc., C/A No. 1:04-1370 (D.S.C. 2004), ECF No. 4.)

37. By letter dated July 3, 2001, Plaintiff was notified that her claim had been reviewed and that the denial of her TPD benefits had been upheld. (Joint Stipulation 1 at WSRC 0045.) It was determined that the Plaintiff's medical restrictions did not preclude her from sedentary employment. (*Id.*) Plaintiff was informed that the appeal decision was final and that she had exhausted her appeal rights under the Plan. (*Id.*)

38. On August 19, 2001, Dr. Sue-Ling completed a Cardiac Residual Functional Capacity Questionnaire for Plaintiff. (Joint Stipulation 2 at WSRC 0622-0627.) Dr. Sue-Ling indicated that he had been treating Plaintiff for high blood pressure and chest pains since January 1993 and that Plaintiff was, at that time, totally disabled and incapable of performing even "low stress" jobs because she has chest pains caused by work. (*Id.* at WSRC 0622-0624.) Dr. Sue-Ling indicated that Plaintiff was not a malingerer. (*Id.* at WSRC 0622.)

39. On August 24, 2001, Plaintiff's sister completed a Third Party Daily Activities

---

[1] The parties disagree with regard to Plaintiff's termination date. Plaintiff contends that she was terminated on May 9, 2001. (Complaint at ¶¶ 1-5, 7, Walker v. Bechtel Savannah River, Inc., C/A No. 1:04-1370 (D.S.C. 2004), ECF No. 1.) This date discrepancy does not affect the court's analysis.

Questionnaire about Plaintiff. (Joint Stipulation 2 at WSRC 0642-0648.) On August 29, 2001, Plaintiff completed a Daily Living Questionnaire regarding her daily activities at that time. (*Id.* at WSRC 0631-0636.)

40.   On September 6, 2001, Plaintiff, through her attorney, sought to re-open the claims process to submit new evidence to establish the Plaintiff's disability. (Joint Stipulation 1 at WSRC 0046.) In a letter dated September 10, 2001, the Plan Administrator acknowledged the request but refused to allow the submission of new evidence, stating that Plaintiff's appeal rights were exhausted upon the denial of her appeal. (*Id.* at WSRC 0047.)

41.   On October 11, 2001, the Social Security Administration (SSA) determined upon reconsideration that Plaintiff was disabled as of October 30, 2000. (Joint Stipulation 2 at WSRC 0650.) By letter dated October 21, 2001, Plaintiff was notified of SSA's favorable determination. (*Id.* at WSRC 0652.)

42.   On October 30, 2001, a vocational analysis of Plaintiff was completed, which indicated that Plaintiff's exertional residual functional capacity was sedentary, and that Plaintiff could not return to past work or perform other work. (Joint Stipulation 2 at WSRC 0629.)

43.   On or about December 19, 2001, Plaintiff requested that Defendants send her "a complete set of the Employee Welfare Benefit Plan documents (i.e., the Summary Plan Description, the Plan, and any amendments, etc.) in effect on and since October 1, 2000." (Joint Stipulation 2 at WSRC 0765.) Plaintiff indicated that she particularly needed information on disability and life benefits. (*Id.*) In response to Plaintiff's request, Defendants sent Plaintiff the Summary Plan Description for the WSRC/BSRI Disability Income Plan on April 16, 2002. (*Id.* at WSRC 0767.)

44.   Plaintiff filed the instant action on May 3, 2004.

45.    The parties filed a joint stipulation and the administrative record on December 1, 2005. (Joint Stipulation 1.)  On December 5, 2005, Defendants filed a Memorandum in Support of Judgment.  (Memorandum in Support of Judgment, Walker v. Bechtel Savannah River, Inc., C/A No. 1:04-1370, ECF No. 37.)   On December 6, 2005, Plaintiff filed a Memorandum of Law in Support of Judgment in Favor of Plaintiff.  (Memorandum in Support of Judgment, Walker v. Bechtel Savannah River, Inc., C/A No. 1:04-1370, ECF 40.) On December 22, 2005, Defendants replied to Plaintiff's memorandum of law. (Defendants' Reply to Plaintiff's Memorandum in Support of Judgment, Walker v. Bechtel Savannah River, Inc., C/A No. 1:04-1370, ECF No. 44.)

46.    On September 13, 2007, Judge Floyd entered an order remanding this case to the Plan Administrator for ninety days with the consent of both parties to address the procedural and notice issues raised by Plaintiff.  (Text Order, Walker v. Bechtel Savannah River, Inc., C/A No. 1:04-1370, ECF 63.)  On December 11, 2007, the day before the expiration of Judge Floyd's ninety-day remand, Plaintiff's counsel submitted numerous documents for the Plan Administrator's consideration.  (See Joint Stipulation 2 at WSRC 0147.)  On December 12, 2007, the Plan Administrator issued a determination letter again denying Plaintiff benefits, but without considering the December 11, 2007 submission.  (*Id.* at WSRC 0864.)  On December 13, 2007, Judge Floyd extended the remand to February 12, 2008 so that the Plan Administrator could review the December 11, 2007 submission.  (Text Order, Walker v. Bechtel Savannah River, Inc., C/A No. 1:04-1370, ECF No. 70.)

47.    On February 12, 2008, after reviewing the additional material submitted by Plaintiff, the Plan Administrator issued an additional determination denying Plaintiff benefits due to a lack of objective medical information to support Plaintiff's claim.  (Joint Stipulation 2 at

WSRC 0861-0887.) The Plan Administrator noted that many of the new medical records were not considered because they were dated beyond Plaintiff's termination date. (*Id.* at WSRC 0861.) With regard to Plaintiff's knee injury, the Plan Administrator noted that subsequent to 1997, there is no mention of this injury indicating that this issue was resolved at the time of Plaintiff's termination. (*Id.* at WSRC 0862.) With regard to Plaintiff's heart condition, the Plan Administrator noted that Plaintiff has a heart murmur, but that her high blood pressure and MR were under control; and that Dr. Sue-Ling suggested a four month follow-up, weight loss, and a low salt diet. (*Id.*) In addressing Plaintiff's asthma and sleep apnea, the Plan Administrator reviewed Dr. Kittle's April 20, 2001 notes, which covered Plaintiff's last office visit before her termination date. (*Id.* at WSRC 0862.) Dr. Kittle described Plaintiff's asthma as "mild, persistent, and well-controlled." (*Id.*) Dr. Kittle described Plaintiff's sleep apnea as "stable and asymptomatic on h.s. nasal CPAP." (*Id.*)

48. On April 1, 2008, the court reopened the case pursuant to Plaintiff's unopposed motion. (Text Order, Walker v. Bechtel Savannah River, Inc., C/A No. 1:04-1370, ECF No. 78.) On May 16, 2008, the parties filed a Supplemental Joint Stipulation and supplemental administrative record from the remand. (Joint Stipulation 2.) Plaintiff and Defendants filed supplemental memoranda on June 2, 2008. (Defendants' Supplemental Memorandum in Support of Motion for Judgment and Plaintiff's Amended Memorandum of Law in Support of Judgment in Favor of Plaintiff, Walker v. Bechtel Savannah River, Inc., C/A No. 1:04-1370, ECF Nos. 88 and 89.) On June 13, 2008, Defendants replied to Plaintiff's supplemental memorandum. (Defendants' Reply to Plaintiff's Amended Memorandum in Support of Judgment, Walker v. Bechtel Savannah River, Inc., C/A No. 1:04-1370, ECF No. 92.)

49.     On June 17, 2010, Defendants filed a supplemental brief as to Title 29 U.S.C. § 1132(c). (Defendants' Supplemental Brief as to Title 29, United States Code § 1132(c), Walker v. Bechtel Savannah River, Inc., C/A No. 1:04-1370, ECF No. 94.) On June 24, 2010, Plaintiff responded to Defendants' supplemental brief. (Plaintiff's Reply to Defendants' Supplemental Brief as to Title 29, United States Code § 1132(c), Walker v. Bechtel Savannah River, Inc., C/A No. 1:04-1370, ECF No. 95.) On June 25, 2010, Defendants replied. (Defendants' Reply as to Title 29, United States Code § 1132(c), Walker v. Bechtel Savannah River, Inc., C/A No. 1:04-1370, ECF No. 96.)

50.     On August 18, 2010, this case was reassigned to the undersigned for disposition.

## CONCLUSIONS OF LAW

**I.     Whether the Denial of TPD Benefits was Proper**

A.      Standard of Review

1.      The parties disagree as to whether the court is to apply an abuse of discretion or modified abuse of discretion standard due to a possible conflict of interest. The modified abuse of discretion standard was disapproved in *Metropolitan Life Insurance Co. v. Glenn*, 128 S.Ct. 2342, 2348 (2008), which was issued subsequent to the parties' supplemental briefs in support of judgment. In *Glenn*, the Court determined that in ERISA cases where the plan administrator has discretionary authority to determine eligibility for benefits the courts must apply the abuse of discretion standard. *Id.* at 2348. However, the Court went on to find that when a plan administrator is operating under a conflict of interest, "that conflict must be *weighed as a factor* in determining whether there was an abuse of discretion." *Id.* (emphasis in original); *see also Champion v. Black and Decker, Inc.*, 550 F.3d 353, 358 (4th Cir. 2008) ("when the plan grants the administrator discretionary authority to determine eligibility for

benefits, . . . a deferential standard of review is appropriate. . . . [I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion."). Thus, the court will apply the abuse of discretion standard taking into account any conflict of interest.

B.     Whether a Conflict of Interest Existed

2.     The Supreme Court has held that when a plan administrator or employer serves in the dual role of evaluating claims for benefits and paying the claims, there is a conflict of interest. *Glenn*, 128 S.Ct. at 2348; *Champion*, 550 F.3d at 358. However, courts must also evaluate the strength of the conflict of interest based on the facts of each particular case. *See Glenn*, 128 S.Ct. at 2351 ("any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.").

3.     Because BSRI and WSRC are the sponsors, administrators, claims administrators and trustees of the Plan, there is a conflict of interest. However, the reimbursement of all benefits paid from the Plan by the Department of Energy indicates that the conflict of interest is slight.[2] This is because the reimbursement cancels out any expense to BSRI and

---

[2] Plaintiff seeks to strike the portion of the Affidavit of former Plan Administrator Lisbeth Mann stating that the Department of Energy reimburses all benefits paid out under the Plan. Plaintiff argues that the parties stipulated that the court should decide the case on the administrative record and that this evidence would not be admissible in court. The parties have stipulated that "this court may disposed of this matter based upon [the joint stipulations], the attachments [thereto] and the various memoranda in support of or

WSRC from paying out benefits. *See White v. Coca-Cola Co.*, 542 F.3d 848, 858 (11th Cir. 2008) (finding no conflict of interest when benefits are paid from a trust that is funded through periodic contributions so that the provider incurs no immediate expense as a result of paying benefits); *Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1562 (11th Cir. 1990) (finding no conflict of interest when an insurance company acted as a plan administrator and received full reimbursement from the plan sponsor for covered claims).

C.     Reasonableness of Plan Administrator's Decision

4.     A plan administrator's discretionary decision "will not be disturbed if reasonable, even if the court itself would have reached a different conclusion." *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 341 (4th Cir. 2000) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)); *Champion*, 550 F.3d at 359 (plan administrator's decision upheld if reasonable). In weighing the reasonableness of the plan

---

opposition to judgment which have or will be filed. [Joint Stipulation 2 at 1; *see also* Joint Stipulation 1 at 2]. The court agrees that it may not consider extrinsic evidence in reviewing the Plan Administrator's action. *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 608-09 (4th Cir.1999). However, whether the Plan Administrator had a conflict of interest was not addressed in the Plan Administrator's decision. Thus, it is proper to consider extrinsic evidence on this issue. The parties stipulation does not indicate a contrary agreement. The court declines to strike the portion of Lisbeth Mann's affidavit that indicates that the Plan is reimbursed by the Department of Energy.

The court notes that Judge Floyd entered a text order on September 12, 2006 "granting in part and denying in part Plaintiff's Motion to Strike the Affidavit of Lisbeth Mann." (Text Order, Walker v. Bechtel Savannah River, Inc., et al., C/A No. 1:04-1370 (D.S.C. 2004), ECF No. 55.) The text order, however, does not disclose which parts of the affidavit were stricken and which were admitted, stating that this issue would be addressed in the court's order on the pending motions for judgment. As Judge Floyd subsequently remanded the case and never issued an order on the motions for judgment, the details of the order were never disclosed. As a result, the court does not construe this ruling as the law of the case and has made its own determination. *See Fayetteville Inv. v. Comm. Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir. 1991) ("An interlocutory order is subject to reconsideration at any time prior to the entry of a final judgment."); Fed. R. Civ. P. 54(b) (providing that interlocutory orders that resolve fewer than all claims are "subject to revision at any time before the entry of [final] judgment").

administrator's determination, the court considers the following factors, among others:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth*, 201 F.3d at 342-43.

5.  When "an ERISA administrator rejects a claim to benefits on the strength of substantial evidence, careful and coherent reasoning, faithful adherence to the letter of ERISA and the language in the plan, and a fair and searching process, there can be no abuse of discretion." *Evans v. Eaton Corp.*, 514 F.3d 315, 325-26 (4th Cir. 2008). Moreover, the quantum of evidence necessary to qualify as "substantial" is not great; it must be more than a scintilla, but can be less than a preponderance. *Ellis v. Metro Life Ins. Co.*, 126 F.3d 228, 235 (4th Cir. 1997).

6.  Plaintiff contends that the decision of the SSA finding Plaintiff disabled under its guidelines as of October 30, 2000 indicates that the Plan Administrator's decision was unreasonable. However, the decision of the SSA is not dispositive because the definition of total disability under the Plan, inability to work at any reasonable occupation due to an accident or illness, does not mirror SSA's definition of disability.[3] *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 607

---

[3] Under the SSA regulations, "disability" is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

(4th Cir.1999) (stating that SSA decisions are not subject to any more favorable weight than any other evidence in ERISA cases when the definition of disability under the plan does not mirror the relevant definition under the SSA regulations).

7.      Plaintiff objects to the Plan Administrator's failure to consider exhibits 12-17, which were submitted by Plaintiff on remand. (Joint Stipulation 2 at WSRC 0865-886.) Because the Plan provides that an individual's eligibility for coverage ends when the individual is no longer an active employee, the only evidence relevant to the Plan Administrator's determination was evidence addressing Plaintiff's condition on or before her termination date. *See Robinson v. Phoenix Home Life Mut. Ins. Co.*, 7 F. Supp. 2d 623, 632 (D. Md. 1998) (finding that when the plan required plaintiff to establish total disability while still employed, only medical history prior to termination was relevant to the claim); *Lockhart v. Jefferson Pilot Fin. Ins. Co.*, No. 03 CV 1745, 2009 WL 901140, at *2 (N.D. Ill. Mar. 31, 2009) ("a psychiatric evaluation more than eighteen months after Plaintiff's termination does little to assist this court in determining whether Plaintiff was disabled at the time of her termination.").

8.      Exhibit 12, a Cardiac Residual Functional Capacity Questionnaire indicating that Plaintiff is totally disabled was completed by Dr. Sue-Ling on August 19, 2001. This exhibit was not relevant to the Plan Administrator's decision because it was completed over three months after Plaintiff's termination and does not indicate when Plaintiff became totally disabled or why she is totally disabled. Similarly, exhibits 13 and 14 were created after Plaintiff's termination and address Plaintiff's condition at that particular time. Neither document addresses Plaintiff's condition prior to her termination. Therefore exhibits 13 and 14 were also irrelevant to the Plan Administrator's decision.

9.      Exhibits 15 and 16 reflect SSA's determination that Plaintiff was disabled as of October 30, 2000. Because these exhibits address Plaintiff's condition prior to her termination, they should have been considered by the Plan Administrator. However, if the Plan Administrator's decision is supported by substantial evidence, the failure to consider exhibits 15 and 16 would constitute harmless error, and the Plan Administrator's decision must be upheld.

10.     Exhibit 17 contains job descriptions for the following occupations: 1) laborer, electroplating and 2) construction worker I. These exhibits appear to describe Plaintiff's former work. They are not relevant to the Plan Administrator's determination on LTD benefits because to qualify, Plaintiff must show that she cannot perform any reasonable job.

11.     Plaintiff objects to the Plan Administrator's rejection of Dr. Sue-Ling's opinion that Plaintiff is totally disabled, contained in his April 26, 2001 letter. According to Plaintiff, Defendant's disregard for the treating physician's opinion is evidence of its improper and biased review of Plaintiff's claim. Plaintiff, however, concedes that the SSA's "treating physician rule" does not apply to disability determinations under employee benefits plans covered by ERISA. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833-34 (2003). Therefore, whether the SSA would defer to Dr. Sue-Ling's opinion is of no moment because, under ERISA, plan administrators are not obligated to accord special weight to the opinion of a treating physician. *Id.* However, plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834.

12.      The Plan Administrator specifically noted that Dr. Sue-Ling's opinion did not comport with his treatment notes. The court finds that this determination was proper. Specifically, Dr.

Sue-Ling noted in May of 2000 that Plaintiff was capable of returning to work once her cellulitis had resolved. While Dr. Sue-Ling's April 26, 2001 letter indicates that Plaintiff is totally disabled, it gives no basis for this opinion or indication of when Plaintiff's condition changed. Indeed, as noted by the Plan Administrator, Dr. Sue-Ling's notes from Plaintiff's May 10, 2001 visit indicate that her conditions were stable. Thus, the Plan Administrator's decision not to credit Dr. Sue-Ling's opinion that Plaintiff was totally disabled was reasonable.

13. The court concludes that it was reasonable for the Plan Administrator to find that Plaintiff was capable of sedentary work. This is because the Plan Administrator reasonably rejected Dr. Sue-Ling's opinion and none of Plaintiff's other treating physicians indicated that Plaintiff was totally disabled.

14. The court concludes that Plaintiff's claim was evaluated by a thorough and reasoned administrative review process. The decision of the Plan Administrator was supported by substantial evidence. As such, the Plan Administrator did not abuse her discretion.[4]

**II.    Whether Plaintiff was Denied a Full and Fair Review of the Decision Denying her Claim**

15. Plaintiff contends that she was denied a full and fair review of the Plan Administrator's decision in part because the Plan Administrator refused to consider new evidence. Because the court remanded this case to the Plan Administrator, who considered the additional

---

[4] Because the court did not find for Plaintiff on this issue, Plaintiff's request for a damages hearing is denied.

evidence and issued a new determination, this issue is now moot.[5]

16.     Plaintiff contends that Defendants' denial letters were inadequate because they failed to outline Plaintiff's rights under ERISA and failed to cite to plan language. Title 29, United States Code, Section 1133 requires that "every employee benefit plan . . . provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant. . . ." *Id.* Regulations in place at the time of the denial of Plaintiff's claim required that denials include:

>    (1) The specific reason or reasons for the denial;
>
>    (2) Specific reference to pertinent plan provisions on which the denial is based;
>
>    (3) A description of any additional material or information necessary for the claimant to perfect the claim, and an explanation of why that material or information is necessary; and
>
>    (4) Appropriate information as to the steps to be taken if the [claimant] wishes to submit [the] claim for review.

29 C.F.R. § 2560.503-1(f) (1984). The Fourth Circuit requires that beneficiaries be provided with "specific reasons for the denial of benefits." *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 158 (4th Cir. 1993).

17.     The court finds that Defendants' denial letters adequately meet the requirements of ERISA. In the first denial letter, Plaintiff was informed that after reviewing her medical records, it

---

[5] The court notes that the Plan Administrator considered new evidence for Plaintiff's initial appeal. With regard to Plaintiff's request that the Plan Administrator reopen her case and receive additional evidence on September 6, 2001, the Plan Administrator was under no obligation to grant this request when Plaintiff had already had the opportunity to submit additional evidence on appeal and Plaintiff had exhausted her administrative remedies. *See Toler v. Pine Ridge Coal Co.*, 131 F.3d 136 (Table), 1997 WL 774464, at *2 (4th Cir. Dec. 17, 1997) (administrator properly used discretion to set deadline for plaintiff to submit additional evidence).

had been determined that she did not meet the qualifications for a TPD benefit because she could work at the sedentary level. Plaintiff was also informed of her appeal rights. Defendants' initial denial letter made clear why Plaintiff's claim was being denied and referenced the TPD benefit section of the Plan. Moreover, Plaintiff's timely appeal of this decision and submission of additional medical records indicates that Plaintiff understood the meaning of the initial denial letter. In the second denial letter addressing Plaintiff's appeal, Plaintiff was informed that her claim for TPD benefits had been denied again because her medical restrictions did not exclude her from sedentary employment. The court finds that this letter meets the requirements of § 1133.

18. Plaintiff contends that the appeal period of sixty days provided by Defendants was unconscionable. The court disagrees. Title 29, Code of Federal Regulations, Section 2560.503-1 (1984), which was in effect at the time of Plaintiff's denial, states:

> A plan may establish a limited period within which a claimant must file any request for review of a denied claim. Such time limits must be reasonable and related to the nature of the benefit which is the subject of the claim and to other attendant circumstances. In no event may such a period expire less than 60 days after receipt by the claimant of written notification of denial of a claim.

*Id.* Although the Department of Labor amended the ERISA regulations to require a 180 day period for appeal the following year, this regulation was not retroactive. 29 C.F.R. § 2560.503-1(h)(3)(I)-(h)(4). Because the Plan met the requirements of the regulations in effect at the time Plaintiff's claim was initially denied, the court finds that the sixty day appeal period was proper. Indeed, the court notes that Plaintiff met the appeal deadline by filing an appeal sixteen days after her claim was denied, indicating that the sixty day deadline for filing an appeal did not prejudice her.

### III. Statutory Damages Under 29 U.S.C. § 1132

19.     Plaintiff seeks an award of statutory damages under 29 U.S.C. § 1132(c)(1) because Defendants failed to timely produce requested Plan documents.  Specifically, on December 19, 2001, Plaintiff requested a complete set of "Employee Welfare Benefit Plan" documents (i.e., the Summary Plan Description, the Plan, and any amendments, etc.) in effect on and since October 1, 2000." (Joint Stipulation 2 at WSRC 0765.)  On April 22, 2002, Defendants responded to Plaintiff's request by sending only the Summary Plan Description for the WSRC/BSRI Disability Income Plan.  (Joint Stipulation 2 at WSRC 0767.)  Defendants initially argued that Plaintiff's request was untimely under a one-year statute of limitations. The Fourth Circuit recently ruled in *Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 338–39 (4th Cir. 2009), however, that a three-year limitations period applies to § 1132 claims.  Therefore, this claim is not untimely.

20.     Title 29, United States Code, Section 1132(c)(1) provides:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to [$110][6] a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

*Id.*     Title 29, United States Code, Section 1024(b)(4) (1997), one of ERISA's disclosure provisions that was in effect at the time Plaintiff made her request for documents, provides

---

[6] The original fine of $100 per day has been increased to $110 per day for violations occurring after July 29, 1997.  29 C.F.R. § 2575.502c-1.

in relevant part:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

*Id.* Section 1024(b)(4) is inapplicable in this case because Plaintiff did not request the latest documents in effect, but asked for the documents in effect on October 1, 2000. Therefore, Defendants were not obligated to provide the requested documents under § 1024(b)(4).

21. Title 29, United States Code, Section 1133 provides in relevant part:

> In accordance with regulations of the Secretary, every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

*Id.* To implement 29 U.S.C. § 1133, 29 C.F.R. § 2560.503-1 was promulgated. Section 2560.503-1(h), which was in effect at the time Plaintiff made her request, provides:

> (1) In general. Every employee benefit plan shall establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination.
>
> (2) Full and fair review. Except as provided in paragraphs (h)(3) and (h)(4) of this section, the claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures–
>
> . . .
>
> > (iii) Provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits.

*Id.* The court concludes that a penalty should not be imposed based on the requirement of

§ 2560.503-1(h). The purpose of allowing a claimant to examine documents relevant to his or her claim under § 2560.503-1(h) is to ensure that the claimant can meaningfully participate in the review process required by § 1133. Plaintiff did not request documents until December 19, 2001. The Plan Administrator's decision on Plaintiff's appeal was dated July 3, 2001. Thus, Plaintiff's request was made after these documents would have been of any use in the appeal. Moreover, Plaintiff admits that she had all documents she needed by August 2, 2004. (Plaintiff's Memorandum in Support of Judgment at 21, Walker v. Bechtel Savannah River, Inc., C/A No 1:04-1370 (D.S.C. 2004), ECF No. 40.) Thus, Plaintiff already had all of the documents she needed to meaningfully participate in the review process on remand in 2007. *See Palmer v. University Medical Group*, 994 F. Supp. 1221, 1241(D. Or. 1998) (declining to impose a penalty when a claimant's document request was made subsequent to a final decision on appeal).

Accordingly, it is **ORDERED** that judgment be entered in favor of Defendants.

**IT IS SO ORDERED.**

s/ Margaret B. Seymour
The Honorable Margaret B. Seymour
United States District Judge

Columbia, South Carolina
September 17, 2010